J-S15013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1586 WDA 2019 |

Appeal from the Order Entered September 26, 2019
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-18-0292

| | | |
|---|---|---|
| IN THE INTEREST OF: C.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1587 WDA 2019 |

Appeal from the Order Entered September 26, 2019
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-17-0286

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 2, 2020**

S.L. ("Father") appeals from the orders dated September 20, 2019 and entered September 26, 2019, which granted the petitions filed by McKean County Children and Youth Services ("CYS") to involuntarily terminate his parental rights to his minor son, C.L. (born in June of 2013), and his minor

_____

[*] Former Justice specially assigned to the Superior Court.

daughter, D.S. (born in February of 2017) (collectively "Children"), pursuant to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1, 2] Counsel seeks permission to withdraw from further representation pursuant to **Anders v. California**, 386 A.2d 738 (Pa. 1967). Upon review, we find that counsel's **Anders** brief satisfies the requirements set forth in **Commonwealth v. Santiago**, 97 A.2d 349 (Pa. 2009), and that there are no non-frivolous claims that Father can raise herein. Accordingly, we grant counsel's petition to withdraw and affirm the orphans' court's termination orders.

We glean the following facts and procedural history from the record. C.L.'s case was initiated by CYS on March 8, 2016, with the filing of a request for emergency custody and a dependency petition. C.L. was adjudicated dependent on May 9, 2016, and was placed into foster care with S.L. ("Foster Mother") and M.L. ("Foster Father") (collectively "Foster Parents"). Following numerous permanency review hearings, CYS filed its petition for involuntary termination of Father's parental rights to C.L. on December 13, 2017. The following findings from the Master's Recommendation in the dependency

---

[1] By *per curiam* order entered November 12, 2019, this Court consolidated the appeals at Nos. 1586 and 1587 WDA 2019, *sua sponte*.

[2] The parental rights of L.L. ("Mother") were also terminated; however, she filed separate appeals at Nos. 1602 and 1603 WDA 2019.

action were adopted by the orphans' court and incorporated in its memorandum regarding the termination of Father's parental rights of C.L.:

> [C.L.] has resided exclusively with [Mother and Father] and his 4 year old half[-]brother since birth. [Mother and Father] moved into their current residence in November [of] 2015. [They] admit to locking [C.L.] and his 4[-]year[-]old sibling [(collectively "the boys")] into their bedroom for periods of time during the moving process so that the [boys] could not get into unsafe items or hurt themselves while the parents were moving items. In fact, [F]ather testified that they bought the locks for this purpose.
>
> On January 6, 2016, [CYS] received a report regarding the [boys'] being locked in their room. On January 8, 2016, [c]aseworker[,] Lindsey Johnston[,] was able to get into the home. She arrived around 1:30 p.m.[,] and the [boys] were upstairs in their bedroom at that time. There was feces on the wall and the floor of the boys' room[,] and the room smelled of feces. There were also dirty diapers under the beds. Mother explained to her that [the] boys were going through a phase where they were smearing their feces on the wall. Both boys were in diapers and were not toilet trained. There were no locks on [the] outside of [the] door, but [she] could see holes where a lock would have been. Ms. Johnston discussed at various times possible service providers with [Mother and Father], but they were not willing to accept services due to an issue that they previously had with Parents as Teachers until after the [boys] were removed from the home. To her knowledge[,] when she was in the home, [Mother and Father] were closing both doors to the stairs when the [boys] were upstairs[,] prior to the safety plan being put into place on February 17, 2016. At other times throughout [CYS's] involvement with the family[,] both before and after the safety plan was put in place, caseworkers took pictures of the [boys] in their bedroom window at various times throughout the day. On at least one occasion after [implementation of] the safety plan, a picture was taken at one time and then another taken approximately an hour later[,] and the [boys] were still in their upstairs bedroom window. On January 29, 2016, two caseworkers (Ms. Dunkle and Ms. Little) were in the home for a home check and watched the [boys] change their own diapers.
>
> Two other adults, Shelby Hagen and Matthew Carlson, who resided in the same residence with the family from approximately

December [of] 2015 until late February [of] 2016, both testified that [Mother and Father] kept the [boys] in their rooms for extended periods of the day and that the [boys] were up typically before their parents. Also, Ms. Hagen, Mr. Carlson, and [M]other acknowledged that the [boys] actually played in their feces and smeared it on themselves four to five times. Mother characterized the boys['] doing this as a "habit" during testimony and [as] a "phase" to caseworker Johnston, which would connote more than a limited number of times. Ms. Hagen and Mr. Carlson assisted [Mother and Father] with the [boys] at least a few times per week when [they] were sleeping. [CYS] witnessed Mr. Carlson attending to the [boys] on at least one occasion while [Mother and Father] slept. The [boys] woke between 6:00 a.m. and 7:00 a.m. each day and were allowed to be awake for a couple hours, then took a nap upstairs in their room with the door shut, as well as the two doors on the steps being closed. The [boys] also often took "naps" in the afternoon and were often shut in their room in the afternoon as well. The bedroom was devoid of toys or anything with which the [boys] could occupy themselves.

On February 16, 2016, Jerry Prosser[,] who owns a home next to where [Mother and Father] reside[,] was in the garage of his property when he heard glass break and went to see what was happening. He saw two little boys, both naked, swinging from the curtains hanging out one of the upstairs windows of the family's residence. He went running and hollering[,] afraid he would have to catch one or both of them. However, both boys fell into the room. He heard one boy yell[,] "he's bleeding." He started banging on the door to [the] residence[,] and after 45 to 50 seconds[,] he heard a woman's voice asking what's going on in there. He told the woman through the window he was an EMT and asked to check [on] the child. Eventually, he was let in the door[,] and [he] went upstairs. [Father] did not know why he was in the house and had not even gotten upstairs until approximately the same time as Mr. Prosser. The child was taken to the [e]mergency [r]oom in the family's vehicle and received stitches to his leg. On that date, Mr. Prosser observed the house to not be kept and stated [that] it was quite a bit cooler upstairs than downstairs.

The next day, February 17, 2016, [CYS] put in place a safety plan, which was signed by both [Mother and Father], to address supervision of the [boys]…. [O]ne of the requirements of this safety plan was that the doors between the upstairs and downstairs needed to remain open, as did the door to the [boys'] bedroom. However, on multiple occasions after the safety plan

was in place[,] the doors were observed to be closed[,] and [Mother and Father] admitted to closing the doors occasionally[,] even after the safety plan.

On March 3, 2016, [c]aseworker[,] Brittani Falconi, went to the family's home to see Ms. Hagen and Mr. Carlson on an unrelated matter. When she arrived, she found out the boys were in their room. There was a pile of soiled[,] torn[-]up diapers in the upstairs hallway[,] and the door to the upstairs was closed. When she checked on the boys, their room had a strong odor and there was vomit on the comforters. She took a picture of the diapers in the hallway at 4:06 p.m.…. Ms. Falconi, based on the room conditions, called her supervisor. This prompted [an] on-call [caseworker] to respond, as well as law enforcement. Mother indicated [during her] testimony that the [boys] went for a nap at 4:00 p.m.; however, she told caseworker[,] Danielle Little[,] who was on call that day[,] that the [boys] had gone down for a nap at 11:00 a.m.[,] and it was between 5:00 p.m. and 5:30 p.m. when Ms. Little arrived at the house. Ms. Little and Officer Jason Putt of the Bradford City Police Department both saw vomit and human feces in the boys' room on the wall, floor, and bed[,] and on the [boys]. The door to the upstairs was shut when Officer Putt and Ms. Little arrived. No one could explain why the [boys] were vomiting, so Ms. Little took them to the [e]mergency [r]oom. Upon arrival [at] the [e]mergency [r]oom, one child was wearing shoes, on which human feces was caked[,] and when he took off his shoes, he also had human feces caked on his feet and under his toenails. The other child was wearing footie pajamas[,] on which human feces was caked on the bottoms. Both [boys] had human feces caked under their fingernails.

Mother suffers from bipolar disorder and anxiety and has partial complex seizures. She treats with The Guidance Center[,] and is prescribed medications. Father is diagnosed with intermittent explosive disorder, is treated through The Guidance Center[,] and is prescribed medication.

The Master specifically finds that … [M]other and [F]ather were not providing adequate supervision to [C.L.] or his 4[-]year[-]old sibling by keeping them contained in their bedroom for extended periods of the day. Neither [M]other nor [F]ather acknowledge that there is anything inappropriate about keeping children ages 2 and 4 in a bedroom with a door shut upstairs[, and] with two additional doors shut between the [boys] and the downstairs. This is clearly a lack of appropriate supervision which

led to the [boys] doing things[,] such as smearing their own feces all over their room and themselves[,] … breaking the upstairs window[,] and swinging on the curtains. It is specifically found that [M]other['s] and [F]ather's testimony that the [boys] were unattended for limited periods of time is not credible[,] as otherwise the adults would have noticed the condition of the [boys] and their room[,] and the [boys] could not have gotten human feces under their fingernails and toenails and caked on their feet and shoes in a brief period of time. Even if [M]other['s] and [F]ather's testimony were credible and the [boys] were left completely unattended upstairs with all the doors shut for shorter periods of time, this still evidences an extreme lack of supervision on [M]other['s] and [F]ather's part[,] as these [boys] are 2 and 4 years of age.

Orphans' Court Memorandum ("OCM I"), 9/26/19, at 2-4 (1587 WDA 2019) (quoting Master's Recommendation, 5/19/16).

CYS received a referral regarding D.S. on the date of her birth. Two days later, she was placed in the same foster home as C.L. and their half-brother, pending adjudication. D.S. was adjudicated dependent on December 6, 2017. On November 9, 2018, CYS filed its petition for involuntary termination of Father's parental rights of D.S. The orphans' court incorporated the following findings with respect to D.S. from the dependency hearing in its memorandum regarding the termination of Father's parental rights of D.S.:

At the time [D.S.] was born[,] Mother and Father were separated. Mother had a different paramour who she was residing with and her relationship with Father at the time was hostile…. Paternity testing has confirmed that [Father] is [D.S.'s] biological [f]ather.

After [D.S.'s] birth[,] Mother and Father reconciled. They have a multi[-]bedroom home. It has been kept clean and neat and appropriate for [D.S.] to reside in. [Mother and Father] have a crib there and other appropriate supplies. Concerns were expressed regarding fleas in the home and cat feces and/or vomit. However, other credible witnesses' testimony demonstrated that this is not a significant concern…. CYS … admitted a [c]ertified

[d]riving [r]ecord for Father which … demonstrates a poor driving history. Father has had numerous prior summary traffic violations and suspensions. He also received suspensions for two prior [d]riving [u]nder the [i]nfluence offenses.

Father is employed and there are times that[,] if [D.S. were] in [Mother and Father's] care, Mother would be the primary caretaker for [D.S.] There have been times during visits with [D.S.] that [Mother and Father] have failed to provide appropriate attention regarding [D.S.'s] care. She has been left in her swing somewhat longer than was appropriate without [Mother or Father] taking her out and directly interacting with her. [Mother and Father] have also inappropriately relied on case aides to watch [D.S.] when they go outside to smoke…. [T]he testimony of other credible witnesses did not completely eliminate concerns regarding the lack of interaction[,] but did diminish concerns. For example, Kelly Zetwick, who is employed by [T]he Guidance Center and works with the … family, testified. She stated that she is working with this family as part of the Parent[s] as Teacher[s] program. She has worked with [them] since September of 2017[,] and attends visits at [their] home. She testified that the visits "are going very well," and "[Mother and Father] are participating in the visits." She indicated that [they] both … ask appropriate questions and respond to her suggestions. There were issues regarding missed visits in [their] home. Caseworker Joshua Blotzer testified that several visits were cancelled when he arrived at [Mother and Father's] home and no one answered the door. These visits were scheduled to commence in the morning, [with a] 7:30 a.m. to 8:30 a.m. start time. Although [Mother and Father] certainly should have been awake and prepared for the visits, it is unclear why greater efforts weren't made to wake [them] and to address the problem[.] Caseworker Blotzer testified that he knocked for two or three minutes[,] and when no one responded[,] he left. It was unclear how loud[ly] he knocked…. [Mother and Father] have also had an issue with signing requested releases for CYS to obtain information regarding their progress or lack of progress. Both [Mother and Father] have argued over small details, like a name being misspelled, and used this as an excuse not to sign requested releases or paperwork. This attitude, which doesn't occur all the time, is still troubling and counterproductive. It reflects [their] attempt to battle and nitpick instead of focusing on what needs to be done to get … [C]hildren back into their care.

Orphans' Court Memorandum ("OCM II"), 9/26/19, at 2-4 (1586 WDA 2019)

(quoting Orphans' Court's Findings, 12/6/17).

Additionally, the orphans' court issued the following findings regarding

both Children:

> In both C.L.'s and D.S.['s] dependency proceedings[,] [Mother and Father] were ordered to: 1) follow through with the Parents as Teachers [p]rogram; 2) keep their home clean and neat and appropriate for the return of [Children] at any time; 3) fully cooperate with service providers and CYS at all times; 4) sign releases requested by CYS for the release of information regarding [Mother's and Father's] progress in services and treatment and [with] [C]hildren; 5) attend all medical appointments for … [C]hildren; 6) be awake and ready for visits when CYS and/or service providers arrive at their home with … [C]hildren; and[] 7) provide urine screens when requested by CYS. Visits were set for [twice per] week, 4 hours each.
>
> At a review hearing held on June 21, 2018[,] the court found that [Children] were doing well in the [Foster Parents'] home. However, [C.L.] was experiencing some behavioral difficulties…. [Mother and Father] had missed some of D.S.['s] medical appointments[,] but there was a reasonable explanation [as to] why they had missed several of them. [Mother and Father] did not sign releases as ordered by the court. They would sign some of them but argued … regarding the release of all relevant information, particularly regarding their progress in treatment. The court specifically indicated at the hearing and in the review order for the hearing: "If Mother and Father won't allow the court and CYS to see how things are going[,] the court will assume there is something that [Mother and Father] do not want us to see." The court also found: "Mother's reluctance (regarding the releases and following the plan in general) is motivated, maybe even mandated, by Father." Meetings and discussions with Father and CYS were unproductive. Father constantly wanted to argue, would become angry and irate. There was one very troubling incident. When discussing the plan for [C.L.] and D.S.: "Father completely went off, saying in very nasty terms that he did not care what the court ordered[,] and he called CYS staff very vulgar names." The court, of course, was concerned and troubled that CYS had to face these derogatory and disturbing personal

assaults[,] which included an attempt to belittle staff with negative comments about their bodies and appearance. However, this attitude was most disturbing because it reflected the extended pattern of Father['s] trying to avoid doing what was required by becoming angry and attacking others and the dependency system. The court found: "… Father can't control his anger … and will say and do what he wants[,] even if it hurts his request for reunification [with] his [C]hildren." Father was ordered to complete anger management therapy/counseling. [Mother and Father] were again ordered to sign requested releases and [to] follow the disposition plan. The [f]indings and [o]rder from the June 21, 2018[] review hearing [were] admitted as part of the permanency hearing record.

The next review hearing was held on August 13, 2018. The court found that Father continued to argue with CYS staff and [to] become angry and verbally combative. Father continued to want to argue about what he was being asked to do instead of attempting to do it and follow[ing] the reunification plan. Father was missing medication management appointments that he was required to attend. Father was not following his anger management treatment plan:

> More serious is Father's lack of cooperation with his anger management treatment. It is set forth in a report from Michael Brewer at the Guidance Center that Father is 'very argumentative….' He states that he did not follow through with therapy appointments because he did not feel he needed anger management. He states that he wants to reestablish therapy to finish anger management program, as he implies it will look good for him when trying to get custody.

Despite the prior order mandating anger management counseling for Father, when counsel Brewer's statements were presented at the August 13, 2018[] hearing[,] Father indicated that he was never required to complete anger management. The court again advised him that he was[,] and that the provisions of the reunification plan are not optional[,] and that the court orders have to be followed. Father then indicated that Mr. Brewer was wrong, that he in fact was fully committed to his anger management treatment. The court found both of Father's assertions: 1) that he didn't know he was supposed to go to anger management; and[] 2) that he did cooperate with Mr. Brewer when he eventually started going, incredible.

At the time of the August 13, 2018[] [review] hearing[,] Mother and Father had separated. Therefore, Father's reference in his statements to Counselor Brewer about "getting custody" related to what he believed would be a custody dispute between him and Mother…. Based on the lack of progress regarding the reunification plan and the turmoil in [Mother and Father's] current situation/relationship[,] the visitation schedule was modified to one supervised visit between Father and … [C]hildren each week[,] and one [visit] (separated from that with Father) with Mother. [Mother and Father] had also missed several appointments for themselves and … [C]hildren and were not attending their mental health appointments.

OCM I at 14-17.

The orphans' court held hearings on the termination petitions on April 5, June 11, and August 30, 2019. Multiple witnesses were called by CYS; however, Mother and Father did not testify. *See id.* at 17-37 (summarizing the witnesses' testimony). On September 26, 2019, the orphans' court entered its memoranda and orders terminating Father's parental rights to Children, pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b).

On October 25, 2019, Father filed timely notices of appeal, along with concise statements of matters complained of on appeal, pursuant to 23 Pa.C.S. § 2511(a)(2)(i). Father now presents the following issues for our review, via counsel's *Anders* brief:

1. Whether the [orphans'] court erred and abused its discretion by allowing [CYS] to admit evidence of current criminal charges that were pending against Father[,] as they were not convictions and not relevant to the matter?

2. Whether the [orphans'] court erred and abused its discretion by allowing [CYS] to admit evidence regarding incidents with other children that occurred at least ten years prior to the date of the hearing and[,] thus, were not relevant to the current case?

- 10 -

3. Whether the [orphans'] court erred and abused its discretion by granting [CYS's] petition for involuntary termination of parental rights as the evidence did not support the finding that Father evidenced a settled purpose of relinquishing parental claim to [Children] or failed to perform parental duties as … Father believes that he had complied with all that was requested of him by [CYS?]

4. Whether the [orphans'] court erred and abused its discretion by finding that the termination was in the best interests of [Children] because [C.L.] is aware of his Father's existence, … had been having visitations with his Father[,] and wished to be living with his Father[?]

5. Whether … Father received ineffective assistance of counsel throughout the initial termination hearings[,] as Attorney Kyle Milliron did not have communications with Father until the days of the hearings, failed to show up for appointments, did not answer Father's phone messages, or have discussions with Father regarding his position and evidence to contradict [CYS] witnesses' testimonies[?]

*Anders* Brief at 7-8.

"When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." *Commonwealth v. Rojas*, 875 A.2d 638, 639 (Pa. Super. 2005) (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)).

Court-appointed counsel who seeks to withdraw from representing an appellant on direct appeal on the basis that the appeal is frivolous must:

(1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; (2) file a brief referring to anything that arguably might support the appeal but which does not resemble a "no-merit" letter or *amicus curiae* brief; and (3) furnish a copy of the brief to the [appellant] and advise the [appellant] of

- 11 -

> his or her right to retain new counsel or raise any additional
> points that he or she deems worthy of the court's attention.
>
> *Commonwealth v. Miller*, 715 A.2d 1203 (Pa. Super. 1998)
> (citation omitted).

*Rojas*, 874 A.2d at 639. Father's counsel has complied with these requirements. Counsel petitioned for leave to withdraw, and filed a brief satisfying the requirements of *Anders*, as discussed, *infra*. Counsel also provided a copy of the brief to Father, and submitted proof that he advised Father of his right to retain new counsel, proceed *pro se*, and/or to raise new points not addressed in the *Anders* brief.

Our Supreme Court has held, in addition, that counsel must explain the reasons underlying his assessment of the appellant's case and his conclusion that the claims are frivolous. Thus, counsel's *Anders* brief must satisfy the following criteria before we may consider the merits of the underlying appeal:

> [W]e hold that in the *Anders* brief that accompanies court-
> appointed counsel's petition to withdraw, counsel must: (1)
> provide a summary of the procedural history and facts, with
> citations to the record; (2) refer to anything in the record that
> counsel believes arguably supports the appeal; (3) set forth
> counsel's conclusion that the appeal is frivolous; and (4) state
> counsel's reasons for concluding that the appeal is frivolous.
> Counsel should articulate the relevant facts of record, controlling
> case law, and/or statutes on point that have led to the conclusion
> that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

Upon review of the *Anders* brief submitted by Father's counsel, we find it complies with the technical requirements of *Santiago*. Counsel's *Anders* brief (1) provides a summary of the procedural history and facts of this case; (2) directs our attention, when applicable, to the portions of the record that

ostensibly supports Father's claims of error; (3) concludes that Father's claims are frivolous; and (4) does so by citation to the record and appropriate/applicable legal authorities. Thus, we now examine whether Father's claims are, indeed, frivolous. We also must "conduct a simple review of the record to ascertain if there appear on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." *Commonwealth V. Dempster*, 187 A.3d 266, 277 (Pa. Super. 2018) (*en banc*).

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003).

In his first claim, Father argues that the orphans' court "erred and abused its discretion by allowing evidence of irrelevant, pending, and unadjudicated criminal charges to be admitted by CYS in the termination proceeding." ***Anders*** Brief at 13.[3] Father asserts that the admissibility of this evidence was for the purpose of proving character, in violation of the Pennsylvania Rules of Evidence. ***Id.*** at 13-14. (citing Pa.R.E. 404(b)(1)). He further avers that there is nothing relevant about the criminal charges as they relate to the termination case. ***Id.*** at 14. At the time the evidence was admitted, there was no conviction of record and Father was out on bail. Thus, Father concludes that there was no evidentiary value pertaining to his availability to care for Children, nor did this evidence add any value to CYS's

---

[3] The evidence admitted included criminal docket sheets, an affidavit of probable cause, and a criminal complaint regarding docket no. CP-42-CR-0000341-2019 in the Court of Common Pleas of McKean County. ***See id.*** (citing N.T. Termination, 8/30/19, CYS Exhibits 20, 22). The charges on the docket included 34 counts of forgery, 1 count of tampering with records, 2 counts of unsworn falsification to authorities, and 1 count of false signatures. ***Id.***

case, "other than to attempt to show that Father had bad character…." ***Id.***

Father's claim is frivolous.

As the orphans' court so aptly explained in its Rule 1925(a) opinion:

> First, although the court ruled that the pending charges against Father were admissible, the court gave them no consideration in the analysis of this record. Their admission or lack of admission would not change the decision. Therefore, even if the court erred in admitting them[,] it was harmless error that would not entitle Father to relief.
>
> Second, the pending charges met the minimum requirement for relevancy as they had bearing on whether Father would face criminal sanctions in the future. However, the court fully considered that they were pending charges and not convictions and, therefore, gave them little to no weight or consideration. ***See***[] ***In re Adoption of A.C.***, 162 A.3d 1123, 1132-[]33 (Pa. Super. 2017); ***In re Interest of C.L.***, 648 A.2d 799, 801 (Pa. Super. 1994).

Orphans' Court Opinion ("OCO"), 11/1/19, at 1. We discern no error or abuse of discretion.

Next, Father claims that the orphans' court erred by allowing CYS to admit evidence regarding incidents involving other children that occurred at least ten years prior to the date of the termination hearing and, thus, were not relevant to the current case. ***Anders*** Brief at 13. Father's claim is wholly without merit. As the orphans' court stated:

> First, the use of the term "incidents" does not capture the nature of the evidence that Father is objecting to. Although he does not provide [an] explanation of what specific evidence he is referring to, the court assumes that he is referencing … the following prior action and inaction of Father: a) locking 5 children in a room with the door to the room … cut in half so that the bottom could be left closed and the top portion opened, like a door on a horse stall; b) [keeping] children in the room with no toys, just a bed and mattress[,] "penned up like animals" with one of

them "eating feces;" and[] c) Father['s] being specifically asked to obtain medical care for an infant daughter, refusing to do so[,] and the child dying within hours. These prior incidents of clear abuse were very similar to "incidents" of abuse involving C.L.[,] and[] the legal basis for their admission was fully discussed and analyzed in the court's memorandum and order filed September 26, 2019.[4]

Next, the court specifically indicated in its memorandum that, even without the admission of these prior incidents of similar abuse, CYS had demonstrated by clear and convincing evidence that termination was warranted. Therefore, Father is not entitled to relief regarding this assertion.

OCO at 2 (unnecessary capitalization omitted). The orphans' court's findings

are fully supported by competent evidence in the record.

Father's next two issues pertain to section 2511 of the Adoption Act,

which governs the termination of parental rights and requires a bifurcated

analysis. In addressing his claims, we are guided by the following:

Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the

_____

[4] The orphans' court found that the level of Father's prior efforts, progress, and cooperation with CYS and other service providers to improve his parenting skills had relevance regarding Children's termination case. OCM I at 4. The court provided a detailed outline of the facts it found admissible, along with a lengthy legal analysis, which we do not find necessary to reproduce here. *See* *id.* at 4-14. We note, however, the orphans' court's emphasis that "the length of the analysis should not be taken as an indication that the prior incidents of abuse/neglect are the basis for this decision. It is a factor but[,] even without this evidence[,] there is sufficient evidence in the record to support, by clear and convincing evidence, termination of parental rights." *Id.* at 4.

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

Instantly, the orphans' court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). Father's claim that CYS failed to meet its burden under section 2511(a)(1) and (a)(2) is frivolous, as we need only agree with the orphans' court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Father raises no objection whatsoever to the orphans' court's decision to terminate his parental rights under section 2511(a)(5) or (a)(8). We proceed with analyzing the court's decision to terminate under section 2511(a)(8) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and

> termination of parental rights would best serve the needs and welfare of the child.

> ***

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(8).

> "[T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." **In re Adoption of M.E.P.**, 825 A.2d 1226, 1275-76 (Pa. Super. 2003); 23 Pa.C.S.[] § 2511(a)(8). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. **Id.** Termination under Section 2511(a)(8) does *not* require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. **In re Adoption of T.B.B.**, 835 A.2d 387, 396 (Pa. Super. 2003); **In re Adoption of M.E.P.**, *supra*.

- 18 -

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (emphasis added).

As to the first element of section 2511(a)(8), concerning whether Children have been removed from parental care for twelve months or more, the orphans' court explained that C.L. has been in placement with his Foster Parents for over 3½ years, and D.S. has never resided with Mother and Father. She was placed with Foster Parents two days after her birth in February of 2017. Thus, the statutory period of twelve months has clearly been met.

As to the second element of section 2511(a)(8), regarding whether the conditions which led to Children's removal continue to exist, the orphans' court found that the reason Children were placed into foster care was Father's (and Mother's) "inability to provide stable, safe and appropriate care for [them]." OCM I at 41; OCM II at 47. For example, "[C.L.] was … locked in a room with another young child for extended periods of time and in horrid and dangerous conditions." OCM I at 41. In support of its determination that these conditions still exist, the orphans' court opined:

> [A] plan was put in place to assist [Mother and Father] to understand the dangers and harm [C.L.] had faced[,] to help them develop the skills and insight they desperately need to properly parent. However, time after time after time[,] witnesses testified to Father's explosive anger and confrontational approach. Instead of focusing on the care … [C]hildren need and improving their parenting skills, [Mother and Father] are focused on the immediate fight, creating a fight regarding just about everything. Instead of allowing a caseworker to explain why requests are being made and to consider their suggestions, Father flies off of the handle and calls them derogatory and foul names—often in front of … [C]hildren. Instead of working with service providers to learn parenting skills, Father verbally insults them as well. As

Leslie Kio[5] testified, he is able to pretend he understands a skill during a session, like he is acting, but[] he goes right back to the hostility and does not utilize the skill after the session….

Even though [Mother and Father] have refused to share information and sign releases, there is still evidence in the record that demonstrates that [they] both … have a long, significant[,] and concerning mental health history/conditions. The Guidance Center records reflect that [Mother and Father] have been involved in mental treatment for some time, with sporadic attendance and limited motivation to address their mental health. Father told Dr. von Korf[6] he has been diagnosed with "intermediate explosive disorder" and "a couple of other diagnoses." He reported "seeing a counselor…." With this known history in mind[,] it is very troubling that [Mother and Father] are refusing to allow CYS and … the court additional information regarding their mental health situations…. Father has verbally attacked CYS caseworkers when signatures were requested on releases, saying[,] "call my lawyer." Yet, when CYS sent releases to [Father's] counsel[,] they still were not returned.

In addition to their very negative attitude preventing progress when they do actually appear for appointments, services, etc., [Mother and Father] have a consistent pattern of not showing up at all. The number of missed and late appointments by [Mother and Father] is so substantial it demonstrates: 1) they are intentionally missing them just to be difficult; or[] 2) they have an engrained psychological flaw or condition that prevents them from being able to understand and make meaningful efforts to appear for appointments. They have been late for or failed to appear for: court proceedings, the evaluation with Dr. von Korf (caused him to have to change his schedule for the evaluation), mental health counseling appointments, important school meetings, visits with … [C]hildren, medical appointments, and[] appointments with service providers. [Mother and Father] have

---

[5] Leslie Kio is a counselor with Parents as Teachers. She worked with Mother and Father to assist them with the care of C.L. OCM I at 36.

[6] Dr. von Korf is a clinical psychologist who specializes in the field of bonding and assessment. He met with Mother, Father, C.L., and Foster Parents and conducted several clinical psychology tests. The orphans' court found Dr. von Korf's testimony and opinions "highly credible." OCM I at 19.

been substantially late or failed to attend more appointments, etc., than they have appeared for.

*Id.* at 41-43. *See also* OCM II at 47-49. The court further observed that "there is nothing in the record regarding [Mother and Father's] future plans and how and when we will be at a point where [they] are able to provide appropriate care of [Children]." *Id.* at 43. The court added that since the beginning of the dependency proceedings, the only thing that has changed is "an increase in [Mother's and Father's] hostility to services and an increase in the list of those that have tried to help them[,] only to face Father's anger and hostility." OCM I at 43; OCM II at 49. The court emphasized that "Father is at the center of the majority of the hostility…." OCM I at 43.

Finally, as to the third element of section 2511(a)(8), concerning whether termination of parental rights would best serve the needs and welfare of Children, the orphans' court found that CYS met its burden. *See* OCM I at 44; OCM II at 50. The court determined that sufficient evidence was presented to demonstrate Father is incapable of and/or refuses to provide appropriate care for Children. *Id.* The court elaborated:

> [Father's] mental health situation and history prevent [him] from being able to understand proper parenting techniques and the needs of any children in [his] care. As Dr. von Korf explained, [Mother and Father] still don't recognize the severity of their prior actions, like locking [C.L.] and his half-brother in a feces filled room…. If they are unwilling to accept that there was a problem, and they definitely are not willing to accept that there was, there is[,] no potential for change; and, if there is no potential for change[,] there is the definite, in fact highly likely probability, that if [C]hildren are in their care in the future it will result in further locked rooms and emotionally and physically damaged [C]hildren.

OCM II at 50. We deem the orphans' court's determination under section 2511(a)(8) to be well-supported by the record, and we discern no abuse of discretion.

Having determined that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008). The focus in terminating parental rights under section 2511(b) is on the child, rather than on the parent. *Id.* at 1008. As explained by our Supreme Court:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781,791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, Father argues that the orphans' court erred in determining that terminating his parental rights is in the best interest of Children. He maintains that he was "frequently seeing both [C]hildren, they were aware of his existence, and that at least C.L. wanted to be with [him]…." *Anders* Brief at 16. Father believes that Children will be harmed if he is removed from their lives. He states that he "has never wavered on his desire to be involved in

this case[,] and he feels that the [orphans'] [c]ourt failed to take that into consideration. *Id.* He also points to testimony from Foster Father regarding concerns he had about permanency with Children. *Id.* After careful review of the record, we deem Father's claim to be wholly meritless.

Additionally, a brief has been submitted by counsel for C.L. [7] Counsel for C.L. argues that the court's decision to terminate Father's parental rights is not supported by competent evidence and that severing the bond between Father and C.L. will cause irreparable harm. C.L.'s Brief at 2. Counsel asserts that C.L.'s wishes to be returned to Mother and Father have been made known,[8] and claims that the orphans' court abused its discretion in failing to properly consider the damage that would result from terminating Father's parental rights to him. *Id.* at 5, 7.

---

[7] In *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. *Id.* at 174. Here, C.L. expressed a desire to reunite with Mother and Father. Accordingly, the orphans' court appointed separate legal counsel to represent his legal interest. Counsel for C.L. concedes that D.S. was too young at the time of the termination hearings to credibly express her wishes; thus, his brief is limited to the wishes of C.L. C.L.'s Brief at 1 n.1.

[8] Counsel cites numerous examples in support of his claim. *See id.* at 5 (C.L.'s Spanish teacher, Miss Splain, testifying that C.L. told her he wants to live with Mother and Father) (citing N.T. Termination, 4/5/19, at 173); *Id.* at 6 (caseworker, Elizabeth Girard, testifying that C.L. misses Mother and Father "and would like to go live with them") (quoting N.T. Termination, 6/11/19, at 85); *Id.* (Foster Mother's stating: "If you ask him, [C.L.] says he does want to go live with his [Mother and Father]") (quoting N.T. Termination, 6/11/19, at 85).

In response to Father's claim, and in light of the brief submitted by C.L.'s legal counsel, we review the court's analysis under subsection 2511(b). The orphans' court opined the following regarding D.S. and her bond with Father:

[D.S.] has a very limited bond with [Mother and Father]. For the two years and seven plus months of her life[,] she has been in the care of [Foster Parents,] and she recognizes them as her parental caretakers. The frequent missed visits and appointments by [Mother and Father] ha[ve] limited the bond and connection that [D.S.] could have had with [them]. Further, to the extent that she has one[,] it is a negative bond. [Mother and Father] have an inability to understand and learn how to lovingly interact with her and provide for her needs.

[D.S.] has a strong and stable bond with [Foster Parents], their family members[,] and her brother[,] C.L. If … [C.L.] was removed from [Foster Parents'] home[, D.S.] would suffer a loss from losing her connection with C.L. However, there is also [a] strong basis to terminate Mother's and Father's parental rights for C.L. and to allow him to also be adopted by [Foster Parents].

OCM II at 51.

In regards to C.L., the court concluded:

[C.L.] does have a bond with [Mother and Father], but [it] is not a productive bond. The court accepts Dr. von Korf's opinion that C.L.'s bond with [Mother and Father] "is out to extreme on insecure, ambivalent bond" [which negatively affects] C.L.'s security and development. [9] The court also accepts Dr. von Korf's

_____

[9] Dr. von Korf described an insecure bond as where "a parent downplays [a] child's needs" and "routinely prefers [the] child to be self-occupied." OCM I at 20. He described an ambivalent bond as: "The child is resistant. On shaky terms with parents. Aggressive, cry. Behaviors make no sense. Parents have been inconsistently available. All too often[,] parents are not responding to the child's needs. The child has temper tantrums, [is] anxious." *Id.* at 20-21.

opinion that "if [Mother's and Father's] rights were terminated, and [C.L.] recognizes permanency in [the] foster home, [he] would want therapy [for him], but it would be his final opportunity to get permanency."

OCM I at 44-45.

Contrary to the assertions by Father and C.L.'s counsel, the orphans' court gave weight and consideration to C.L.'s indication that he wants to live with Mother and Father. *See id.* at 45; OCM II at 51. However, the court agreed with Dr. Korf's opinion that:

"C.L.'s preference does not impact my opinions here today. He … feels attachment to [Mother and Father]. He is insecurely attached to them. He has the capacity of a 5 year old. He does not have the ability to step back on his experiences with them." C.L.'s preference is based on the appropriate limits that are placed on him in the foster home. He "does not like the rules in the foster home" and believes there will be less rules and hassle in [Mother and Father's] home. However, it is the existence of those "rules" and stability in the [Foster Parents'] home that give him, an already troubled child due to his past with [Mother and Father], the greatest opportunity to have a productive childhood and [to] grow into a stable adult. It was very revealing when C.L.'s teacher indicated that C.L. [would] tell her that he "hates school" and "I won't have to go to school when I live with [Mother and Father]." Where did this thought come from? C.L. either concluded, because he is an observant young man, that [Mother and Father] aren't on the ball and probably won't be able to get him to school if he resides with them; or, [Mother and Father] told him that he won't have to go to school if he lives with them. Either way, the "lack of school with [Mother and Father]" comment by C.L. demonstrates that his preference is based on his consideration of invalid factors. Therefore, the court concludes that termination of parental rights for C.L. will also best fulfill his developmental, physical and emotional needs and welfare…. [D.S.] will [also] be able to maintain her relationship and connection with C.L.[,] if parental rights are terminated regarding her….

The court specifically finds that: 1) [Foster Parents] have been providing exceptional care for [Children]; 2) [Foster Parents'] ability to provide care for … [C]hildren has been limited by the fact

that [Mother and Father] have refused to assist regarding [Children's] medical, educational[,] and mental health care[,] … and [Foster Parents] do not have authority to do so; and 3) [Foster Parents] plan on adopting [Children] if that is an option.

OCM II at 51-53.

Moreover, the orphans' court also addressed Foster Father's testimony regarding the possibility of adopting C.L.:

> The court has also considered the initial hesitancy that [Foster Father] had regarding adopting C.L. The court finds [Foster Father's] testimony that he is now committed to adopting C.L. credible. The court accepts his explanation that, when he met with Dr. von Korf in June and July of 2018[,] C.L. was having behavioral issues and "it was a big step." Therefore, he "was not 100% on board" with adopting C.L. However, since that time his position has changed. C.L. is doing better [with] controlling his behaviors and "we get along more. He is part of our family."

*Id.* at 52-53. We are convinced that the orphans' court carefully and thoroughly considered Children's best interest, in light of C.L.'s stated preference. We discern no abuse of discretion as to section 2511(b).

Finally, Father claims that he was not provided effective assistance of counsel throughout this matter.[10] He argues that Attorney Milliron only communicated with him on days before the hearings, and that he "failed to show up if appointments were scheduled, failed to answer phone calls, and did not have discussions with Father regarding his position or evidence that he wanted to present to contradict CYS." *Anders* Brief at 16-17. Father believes that the outcome of the hearing would have been different but for

---

[10] Father was represented by Attorney Milliron until the conclusion of the June 11, 2019 hearing. Thereafter, he was represented by Elizabeth K. Feronti, Esquire. OCO at 2.

counsel's failure to effectively represent him.  *Id.* at 17.  Father fails, however, to cite to any legal authority in support of his claims, nor does he provide any specific examples of how the outcome was affected by the alleged ineffectiveness of Attorney Milliron.  *See* OCO at 2-3; *Anders* Brief at 16-17.

"Pennsylvania statutes do not require counsel in termination proceedings, although Pennsylvania case law does … and flowing from this it is presumed that counsel would and should be effective."  *In re Adoption of T.M.F.*, 573 A.2d 1035, 1040 (Pa. Super. 1990).  This Court evaluates ineffectiveness allegations in termination proceedings as follows:

> In the context of a termination proceeding, the best approach … is the fundamental fairness doctrine whereby, in the exercise of its broad scope of review, an allegation of ineffectiveness of counsel on appeal would result in a review by this Court of the total record with a determination to be made whether on the whole, the parties received a fair hearing, the proof supports the decree by the standard of clear and convincing evidence, and upon review of counsel's alleged ineffectiveness, any failure of his stewardship was the cause of a decree of termination.  Mere assertion of ineffectiveness of counsel is not the basis of a remand or rehearing, and despite a finding of ineffectiveness on one or more aspects of the case, if the result would unlikely have been different despite a more perfect stewardship, the decree must stand.

*Id.* at 1044.  Thus, the "fundamentally fair hearing" right to effective assistance of counsel in civil termination cases is more limited than the right to effective assistance of counsel in criminal cases.  *In re J.T.*, 983 A.2d 771, 775 (Pa. Super. 2009).  If competent evidence of record supports the termination decree, it should stand.  *Id.*

A party alleging ineffectiveness in termination matters must "demonstrate such ineffectiveness so undermined the truth determining process that no reliable adjudication … could have been made." ***Matter of J.P.***, 573 A.2d 1057, 1066 (Pa. Super. 1990). Additionally, the party alleging ineffective assistance of counsel in this context "must show by clear and convincing evidence that it is more likely than not that the result would have been different, absent the ineffectiveness." ***In re K.D.***, 871 A.2d 823, 827 (Pa. Super. 2005).

Instantly, Father has failed to demonstrate that, absent the alleged ineffectiveness, the outcome of the termination proceedings would have been different.[11] After careful review, we have concluded that the termination of Father's parental rights is supported by overwhelming, competent evidence in the record. Thus, Father's ineffectiveness claim is frivolous.

Our review of the record reveals no other potential, non-frivolous issues that Father could raise on appeal. As such, we agree with counsel that a direct appeal in this case is wholly frivolous. Accordingly, we grant counsel's petition to withdraw, and we affirm the orders terminating Father's parental rights to Children, pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Orders affirmed. Petition to withdraw granted.

---

[11] The orphans' court further noted that Father had the benefit of his current counsel, Attorney Feronti, since prior to the August 30, 2019 hearing. Hence, Father had the opportunity to meet with her before the record was closed and to present any evidence and/or testimony that was relevant. OCO at 4.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/2/2020